THE PEOPLE, PLAINTIFF AND RESPONDENT, *v.* DÍAZ ET AL., DEFENDANTS AND APPELLANTS.

## APPEAL from the District Court of Guayama in a Prosecution for Conspiracy.

No. 625.—Decided March 27, 1915.

Motion for reconsideration denied April 14, 1915.

DISMISSAL OF PROSECUTION—TRIAL—EXCUSE FOR DELAY.—The 120 days within which criminal actions must be brought to trial should be counted from the date on which the information is filed, but time taken up in interposing dilatory motions and disposing of the same is a good excuse for delay in bringing the case to trial and for not dismissing the prosecution.

EVIDENCE—AFFIDAVIT—MOTION—COUNTER-AFFIDAVIT.—An affidavit regarding matters included in records of proceedings may be admitted in support of a motion, because it does not deprive the adverse party of his right to file counter-affidavits in rebuttal.

CONSPIRACY—MERGER.—The doctrine that an information charging conspiracy to commit a felony and at the same time the commission of the felony charges only the felony, because the lesser offense of conspiracy is merged in the greater offense, is not followed by the great majority of courts or by commentators, and even some of the courts have rejected it.

ID.—FALSIFICATION OF EVIDENCE—MERGER.—The conspiracy to commit a crime, defined in section 62 of the Penal Code, is not merged in the felony of falsifying evidence, defined and penalized by section 128 of the same code, by the fact that the object of the conspiracy was realized, because section 62 refers only to the act of conspiracy regardless of whether the object of the conspiracy is carried out or not. Acts of conspiracy and those of the commission of the crime which is the object of the conspiracy are distinct acts.

DOUBT—DECISION IN CONFORMITY WITH LAW—ERRONEOUS GROUNDS—APPEAL.—
.A statement by the court that it has some doubt as to the decision it is
rendering is not ground for its reversal, nor does it matter whether the
grounds on which it is based are well taken or not provided its decision
is really in conformity with the law. What is considered on appeal is
whether or not the decision conforms to law and not whether the grounds
on which it is based are well taken or not, the provision of law that when
there is any doubt it should be decided in favor of the accused not being
applicable in such cases.

CONSPIRACY—MISDEMEANOR—TRIAL BY JURY.—When the crime charged in the
information is the misdemeanor of conspiracy there can be no trial by
jury, for our laws do not confer that right in cases of misdemeanor.

ID.—EVIDENCE—TESTIMONY OF CO-CONSPIRATOR—DISCRETION OF COURT.—While
it is true that independent evidence of the commission of the offense of
conspiracy is generally required before a conspirator is allowed to testify
to acts and conversations of his co-conspirators, this rule is not so absolute
that the court may not change it, therefore, in the exercise of its discretional
power relative to the order in which the evidence may be admitted, the
court may admit the testimony of a co-conspirator under the condition that
the conspiracy be proven independently, and with greater reason when the
trial is not by jury.

EVIDENCE—TRIAL WITHOUT JURY.—When the trial is by the court without a
jury greater liberality is permissible in the admission of evidence, because
the court can free itself more easily than jurors from the impression caused
by improper evidence.

EVIDENCE—WITNESSES—DOCUMENTS.—Witnesses may refresh their memory from
documents.

ID.—CORPUS DELICTI—STATEMENTS OF CO-CONSPIRATORS.—The testimony .of a
witness regarding conversations or statements by co-conspirators is direct
evidence of the *corpus delicti* in a prosecution for conspiracy if such con-
versations and statements are pertinent to the question under consideration.

ID.—DOCUMENTS.—The fact that a notarial deed is not presented to the court
in the manner prescribed by the Notarial Act does not affect its validity
or authenticity and is no ground for objection to its admission in evidence.

ID.—CONSPIRACY—STATEMENTS OF CONSPIRATOR AFTER ACCOMPLISHMENT OF OB-
JECT.—Statements made by a co-conspirator after the accomplishment of the
object of the conspiracy prejudice only the person making them and not
the others, therefore they are admissible as to him.

INVESTIGATION BY FISCAL—CONTRADICTORY STATEMENTS.—Testimony cannot be de-
manded of a *fiscal* in order to look for contradictions of or variances with
the testimony given at the trial, and for the purpose of showing to a wit-
ness his prior deposition in any case it is necessary first to call his atten-
tion to the discrepancies, in. case they exist, so that he may explain them
before any documentary evidence containing the same is introduced.·

CONSPIRACY—EVIDENCE—ACCOMPLICE—CORROBORATION.—After analyzing the evi-
dence it was held that, taking the evidence as a whole, the appellants par-
ticipated directly in the conspiracy and that the testimony of the accom-
plice was sufficiently corroborated.

ID.—ACCOMPLICE—CORROBORATION.—The testimony of accomplices should be cor-
roborated, in conformity with the provisions of section 253 of the Code

of Criminal Procedure, and when it is alleged that the testimony of the accomplice has not been corroborated and the court holds to the contrary, it should explain the manner in which it has been corroborated.

ID.—EVIDENCE—CIRCUMSTANTIAL EVIDENCE.—A conspiracy such as that charged against the defendants must be proved almost always by circumstantial evidence, for the nature of the offense makes it impossible generally to show by direct proof the plottings and agreements of the conspirators.

ID.—EVIDENCE.—In order to determine whether all of the defendants are principals in the conspiracy, the part taken by each in the accomplishment of the same should be considered in the light of all the acts performed by each, and if it is proven that by their acts the defendants pursue the same object by the same means, one performing one part and another another part, as in the case at bar, the crime is proven.

EVIDENCE—WEIGHT OF EVIDENCE—PASSION, PREJUDICE OR MANIFEST ERROR.— In cases of contradictory evidence the court will not interfere with the weighing of the evidence by the trial court unless it is shown that it was influenced by passion, prejudice or committed manifest error.

INFORMATION—DUPLICITY.—When an information charges different offenses or ways of committing them, a sufficient allegation and proof of any of them justify a conviction.

The facts are stated in the opinion.

*Mr. Charles E. Foote, fiscal,* for The People.

*Messrs. Martín Travieso, Jr., Luis Samalea Iglesias, Manuel F. Rossy* and *Nemesio R. Canales* for the appellants.

MR. JUSTICE ALDREY delivered the opinion of the court.

This case was begun by a sworn information filed by the *fiscal* in the District Court of Guayama on April 19, 1911, charging Pedro G. Goico, Luis Abella Blanco, Pastor Díaz Molinaris and José C. Ramos with the crime of conspiracy. On December 28, 1912, judgment of conviction was rendered by the said court against the first three and they were sentenced to one year in jail at hard labor, each to pay one-third of the costs. The other defendant, José C. Ramos, was acquitted.

The three defendants who were convicted took the present appeal. Goico and Díaz filed extensive briefs which substantially agree as to the questions submitted for our consideration, therefore in examining them we will follow the order established in the brief of Díaz, without prejudice to a further examination of the three distinct questions raised by

Goico. At the opening of the hearing Abella Blanco, who did not file a brief, submitted a memorandum of authorities on one of the questions raised by Díaz and Díaz supplemented his brief by raising new questions. At the hearing on the appeal all the appellants were represented by attorneys and they and the *fiscal* of this court argued the case at length.

The first error assigned is the following:

"In overruling the motion for dismissal of the prosecution (*sobreseimiento*) made by the defendants on the ground that more than 120 days had elapsed since the information was filed and they had not been brought to trial although the trial had not been postponed upon the application of the appellant or of any of the defendants."

It appears from the transcript of the record that in the first part of the month of September, 1911, all the defendants filed a motion in this case praying for dismissal of the prosecution in conformity with the provisions of sections 11 and 448 of the Code of Criminal Procedure, on the ground that more than 120 days had elapsed since the information was filed without their having been brought to trial and they had not asked for its postponement. The *fiscal* opposed the motion, the court overruled it and the appellants excepted to the ruling.

The *fiscal* opposed the motion on two grounds, which, inverting the order in which they were pleaded, are that the period of 120 days referred to in subdivision 2 of section 448 of the Code of Criminal Procedure had not elapsed when the defendants made their motion for dismissal, and that The People had good cause for not bringing the case to trial within the 120 days.

Obviously, these two grounds of objection are contradictory, for if the 120 days fixed by law for bringing the case to trial had not elapsed, there was no need to show good cause for the delay. However, we will consider them separately.

The sections on which the petitioners based their motion read as follows:

"Section 11.—In a criminal action the defendant is entitled:
"1. To a speedy and public trial."

\*          \*          \*          \*          \*          \*          \*

"Section 448.—The court, unless good cause to the contrary is shown, shall order the prosecution to be dismissed (*sobreseimiento del proceso*) in the following cases:

\*          \*          \*          \*          \*          \*          \*

"2. If a defendant, whose trial has not been postponed upon his application, is not brought to trial within one hundred and twenty days after the filing of the information."

It is a matter of fact that from April 19, when the information was filed, to September 5, when the motions for dismissal were made, more than the 120 days fixed by the code had elapsed and the *fiscals* of the lower court and of this court maintain in their briefs that said period had not elapsed because they understand that the 120 days should be counted from the time all the motions of the defendants were disposed of and the case was ready for trial, citing in support of their contention the concurring opinion of Judge Harrison in the case of *People* v. *Buckley,* 16 Cal., 153. However, we do not perceive that the judge said what is attributed to him by the *fiscals.* He reviewed all the motions submitted in the case until they were disposed of and held that if the defendants interposed dilatory motions or pleas for the purpose of extending the time within which they should be brought to trial, that was a good reason for not dismissing the prosecution. He did not say that the period should be counted from the time the case was ready for trial, but that he considered that a good cause had been shown for the delay. In any event, we would not be inclined to compute the period except as prescribed by the law, that is, from the time the information was filed, therefore we conclude that the 120 days which our code allows for bringing the case to trial had expired when the defendants filed their motion for dismissal.

Now, although the law makes it the duty of the judge to dismiss the prosecution when the said period expires without trial, unless the trial is postponed on motion of the ac-

cused, nevertheless the judge is authorized to refuse to dismiss the prosecution when there is a good cause for not doing so, that is, when there is some good excuse for the delay. This being so, we must consider the second ground of the opposition of the *fiscal* and determine whether he justified the delay in the present case. As we have held in several cases, among others those of *The People* v. *Falcastro,* 17 P. R. R., 88, and *The People* v. *Ayala,* 19 P. R. R., 888, and cases there cited, that the judge has discretional power to weigh the cause, and the lower court having decided that there was just cause for the delay in the present case and therefore for not dismissing the prosecution, the question to be decided now is whether it has been shown to us that the judge abused that discretional power.

In support of the objection of the *fiscal* of the district court to the motion of the defendants, on the ground that there was good reason for the delay and therefore for not dismissing the prosecution, *Fiscal* José R. Aponte, who had been specially appointed to prosecute this case, submitted an affidavit signed by himself and also the oral testimony of the Secretary of the District Court of Guayama. Both the affidavit of the *fiscal* and the sworn testimony of the secretary contain many details, therefore, for a better understanding of the excuses presented, we will review them summarily.

It appears from the affidavit of the *fiscal* and the testimony of the secretary that the information was filed in the court on April 19, 1911; that defendants Pastor Díaz and Pedro G. Goico filed a motion on May 2, 1911, asking for trial by jury and on the same day defendant José C. Ramos moved that the defendants be tried separately; that on his part Luis Abella filed a motion alleging that the court had no jurisdiction over his person or of the crime charged; that on May 4, 1911, Harry P. Leake, Judge of the District Court of Guayama, held himself disqualified to try the case and transferred it to the District Court of Ponce, presided

over by Judge Charles E. Foote, who, on May 1, was appointed
special Judge of the District Court of Mayagüez where he
officiated during the months of May and June and disposed
of all matters· pending in that court; that on July 1 Judge
Foote was appointed Judge of the District Court of San
Juan, Section 2, and called a special term on account of the
large amount of work necessary to dispose of the cases accu-
mulated there; that on May 16 the judge of the Ponce court
ruled on the motion of Ramos for separate trials, and al-
though on June 15 and 16 the defendants filed their written
consent to be tried by the District Court of Ponce, on June
30 Luis Abella asked permission to withdraw his consent
to the transfer of the case from Guayama to Ponce and re-
quested that the case be returned to the said District Court
of Guayama, which motion was granted on the same day by
the Judge of the District Court of Ponce; that the District
Court of Ponce was in vacation during the months of May
and June; that on May 17, 1911, the District Court of Guayama
began the trial of the election case of Genaro Cautiño *et al.*
against José Muñoz Vázquez *et al.*, which lasted until June
30, on which day a special term was called in order to go on
with the trial, which was resumed on July 17 and lasted until
August 30, when judgment was rendered; that during all this
time Judge Leake, of the said court, was engaged almost
exclusively in the said case and while he entertained some
other cases during that time they were simply such as ar-
raignments, an action for divorce and an appearance in an
action of unlawful detainer, and from August 4 to August
30, when the court adjourned, the judge was engaged in the
consideration of the election case in order to prepare to ren-
der judgment, as he did on August 30; that defendants Ra-
mos and Abella were engaged as attorneys in the said elec-
tion case and that *Fiscal* Aponte, who had been appointed
to prosecute this case, was also occupied in the District Court
of Arecibo from June 12 to June 30 in the trial of the case
of Rubert Hermanos against The People of Porto Rico and in

some criminal matters, and Attorney J. Henri Brown, who was one of the attorneys in the present case, was also engaged in the said suit.

One of the defendants, José C. Ramos, offered evidence in rebuttal of that introduced by the *fiscal,* which, considered as a whole, shows that the defendants never moved for a postponement of the trial, and that on his part he made several efforts during the earlier stages of the prosecution to secure a speedy trial.

From the statement of the case included in the transcript of the record it appears that the Governor appointed Charles E. Foote as special judge to try this case.

While we agree with the appellants that the fact that two of them were engaged in the trial of the election case is no excuse, nevertheless it may be regarded as a consideration shown them by The People in not prosecuting them criminally when they were engaged as attorneys—although in association with other attorneys—in an election suit, which, to judge by the time it occupied the attention of the court, must have been important. But in any event, considering as a whole the grounds of the excuse alleged by The People, we cannot conclude that the judge of the lower court abused his discretion in holding that the delay in trying the case was justified and, consequently, in overruling the motion of the appellants. The demonstrated manner in which the District Court of Guayama, the special judge appointed to try the case and the *fiscal* designated to prosecute the same were occupied, is sufficient ground for concluding that The People was not at fault in not trying the case within the 120 days following the filing of the information and that the delay was not entirely arbitrary and capricious, therefore the first ground of the appeal cannot be sustained.

Appellant Abella further claims that the lower court erred in admitting the affidavit of the *fiscal* as evidence in support of his opposition to the motion for dismissal, because it contains matters which should be proven by the records of the

proceedings to which it refers, and that they are thus deprived of the right to cross-examine him as to all and any of the facts sworn to by him.  But we do not believe that such error exists because the best way of supporting motions or answers in opposition thereto is by affidavit, and the fact that the affidavit filed by the *fiscal* in the present case makes reference to records of judicial proceedings did not deprive the defendants of their right to file counter-affidavits in rebuttal.

The second error assigned by the appellants is as follows:

"In overruling the demurrer of the defendants on the ground that it appears from the information itself that the conspiracy was merged in the crime of falsifying documentary evidence, which is defined as a felony and made punishable by section 128 of the Penal Code, and for the commission of which the alleged conspiracy was merely a means."

The information substantially charged the appellants with having conspired and plotted to induce Josefa Rivera to sign two motions for leave to withdraw two damage suits, one for breach of promise of marriage and the other for seduction, which she had brought against Pastor Díaz in the District Court of Guayama, in order to present the said motions to the court and cause it to believe that the suits had been compromised and that the plaintiff was willing to abandon them; that the motions were signed and presented to the court, her signatures thereto having been obtained by taking advantage of her youth and ignorance (for she could not read although she knew how to sign her name) by fraudulently misrepresenting to her that a document which they prevailed upon her to sign was an acknowledgment by Pastor Díaz that he was the father of the child of Josefa Rivera, whereas, in fact, the said Josefa Rivera was made to acknowledge in the said document that Ramón Jiménez was the father of the said child although she had never sustained relations of any kind with Jiménez.  The object of the document was not only to pervert public justice with the said motions, but also forever to deprive the child of Josefa Rivera of its right

of action to establish its civil status and condition as the natural child of Pastor Díaz and to obtain immunity for all time of the property of Díaz from any claims which Josefa Rivera and her son Ramón might set up against it.

In support of this assignment of error the appellants maintained that when the object of a conspiracy is the commission of a felony and it appears from the information that the felony was committed, then the lesser offense of conspiracy is merged in the greater offense and the defendant can be tried only for the felony which was the object of the conspiracy. This contention, they claim, is justified by section 62 of the Penal Code which defines conspiracy as the collusion of two or more persons to commit a crime or any of the acts therein specified, such conspiracy, according to the appellants, being punishable only when the crime has not been actually committed.

The purpose of the demurrer to the information is that if the court should find that the object of the conspiracy had been realized, the information charges no other crime than the felony of falsifying evidence as defined and penalized by section 128 of the code, and that the defendants could be prosecuted for that crime only because the offense of conspiracy had merged therein; in other words, that they are charged with a felony and not with a misdemeanor.

We find nothing in the law to justify our holding, as the appellants would have us do, that it may be inferred from section 62 of the Penal Code that the offense of conspiracy is punishable only when the crime which is the object of the conspiracy has not been committed. There is nothing in the language or spirit of said section to justify such a conclusion, for it goes no further than to determine what acts are punishable as conspiracy. The language of the code defining the offense of conspiracy to be the act of two or more persons conspiring to commit a crime, or any of the acts stated in the said section, does not mean that prosecution lies for the said offense only when the object of the conspiracy

has not been realized. To conspire to commit a crime does not mean to conspire to commit a crime and not commit it. The said section refers only to the act of conspiracy regard-less of whether the object of the conspiracy is carried out or not. In truth, the acts of the conspiracy and those of the commission of the crime which is the object of the conspiracy are distinct acts.

But the appellants base their contention chiefly upon the decisions of some courts and cite those rendered in the cases of the *People* v. *Egan,* 116 Cal., 287; *Hoyt* v. *State,* 16 L. R. A. 239, and *United States* v. *Gardner,* 42 Fed. Rep., 829, which citations are found in 6 American and English Encyclopedia of Law, page 863.

Although the said decisions hold that an information charging the offense of conspiracy to commit a felony and at the same time the commission of the felony only charges the felony because the conspiracy being a misdemeanor is merged in the felony, nevertheless that doctrine is not fol-lowed by the great majority of courts nor by commentators, and even some of the courts have rejected it. Thus we see that the Massachusetts court which recognized it in *obiter dictum* in the case of *Commonwealth* v. *Kingsbury,* 5 Mass., 106, does not follow it in the case of *Commonwealth* v. *War-ren,* 6 Mass., 74, nor in the case of *Commonwealth* v. *Walker,* 108 Mass., 309, in which case the court said:

"There is no valid ground for sustaining the motion to set aside the verdict on the ground that the execution of the conspirator's plan was a felony, and merged the lesser offense of the conspiracy. The fact that the defendant has been guilty of a higher offense than that alleged is no defence."

There was a similar holding in *Commonwealth* v. *Stu-art,* 20 Mass., 571, decided in 1911. Neither was the doctrine of the merger of a lesser into a greater offense accepted in Connecticut, New Hampshire and Texas, according to note 76, 8 Cyc., 664, and other citations therein.

In the case of *Waite et al.* v. *State,* 15 Am. Crim. Reps.,

79, the Court of Appeals of Kentucky reviewed that question and after considering the cases of *Commonwealth* v. *Blackburn,* 1 Duv., 4; *Commonwealth* v. *Kingsbury, supra,* and *Elsey* v. *State,* 47 Ark., 572, held that the accused was properly convicted of the offense of conspiracy to defraud under an information charging that offense, although it is a misdemeanor and the facts alleged in the information show that the acts committed by him as a result of the conspiracy constituted felony.

Although the case just cited is very interesting, still more so is that of *State* v. *Effler,* decided in November, 1910, and reported in 78 Atl. Rep., 413, wherein the defendants set up the same plea and cited the same cases as the appellants did in this appeal. In that case, after considering the decisions both for and against that theory, the court concluded as follows:

"We think the decisive weight of recent cases as well as of reason is opposed to the contention of the defendant."

Also, the best-known commentators on criminal law are opposed to the doctrine invoked by the appellants. See paragraph 1609 of Wharton on Criminal Law, Volume II, Eleventh Edition.

In section 814 of volume 1 of Bishop's New Criminal Law the following is said:

"A conspiracy to commit a felony is a step toward the consummation, but it is only misdemeanor. There are American cases which seem to hold that if parties on trial for such a conspiracy are shown to have proceeded in it to the accomplished felony, the misdemeanor is merged, and they cannot be convicted,—a rule, the authorities agree, not applicable where the object of the conspiracy is a misdemeanor. This doctrine * * * is contrary to just principle: it has been rejected in England; and though there may be States in which it is binding on the courts, it is not to be deemed general American law."

In view of the foregoing we must hold that the lesser offense of conspiracy is not merged in the crime of felony,

which was committed as the object of the conspiracy, and that the lower court did not err as alleged in the second assignment of error.

The third assignment of error reads as follows:

"In convicting the accused of the offense of conspiracy notwithstanding the fact that in ruling on the demurrer referred to in the foregoing assignment of error the court stated that *it was in doubt* as to whether the demurrer of the defendants on the ground of the merger of the offense of conspiracy in the crime of felony, as described and penalized by section 128 of the Penal Code, was good or not."

A statement by the court that it has some doubt as to the decision it is rendering is no ground for its reversal, nor does it matter whether its grounds are well taken provided its decision is really in conformity with the law. When we decide an appeal we consider whether or not the decision conforms to law and not whether the grounds on which it is based are well taken or not. As regards the citations of the appellants in support of this assignment of error, holding that when there is any doubt as to whether the act charged comes within the statute such doubt must be decided in favor of the accused, they are not applicable to this case because we have no doubt that the lower court ruled correctly on the demurrer of the appellants because the information only charged the misdemeanor of conspiracy.

The fourth assignment of error is as follows:

"In denying the accused the right of trial by jury claimed by them and in convicting them finally of the offense of conspiracy notwithstanding that they were charged with another offense in the said information, namely, the crime of felony defined and penalized by section 128 of the Penal Code."

After the statement we made in passing upon the second assignment of error and inasmuch as the offense charged in the information was the misdemeanor of conspiracy, we cannot hold that the court committed error in denying the request of the appellants to be tried by a jury, for our laws

do not confer that right in cases of misdemeanor. This assignment does not require further consideration, for, resting as it does upon the upholding of the second assignment of error, our ruling that such error does not exist leaves no ground for this.

As a fifth assignment of error it is alleged that the court erred

"(*a*) In refusing to strike out the testimony of witness Manuel M. Sama on the ground that it was irrelevant."

In his testimony this witness refers to conversations which he had with Ramón Jiménez, one of the conspirators, relative to facts closely connected with the conspiracy, and he further testified that on that same day he saw Goico, Pastor Díaz and Ramos talking together on the balcony of the latter's house. The testimony of this witness tended to corroborate the testimony of Ramón Jiménez to the effect that he had had à conversation with Sama on that same day regarding the signing of the document in question, rather than to charge the defendants with the commission of any offense, for which reason we are unable to see the irrelevancy of said testimony.

"(*b*) In permitting, over the objection of the defendants, witness Ramón Jiménez *alias* Chivo, a co-conspirator, to testify to the acts and conversations of defendant Pastor Díaz without first showing whether such conversations took place before or after the formation of the alleged conspiracy.

"(*c*) In admitting, over the objection of the defendants, and in refusing afterwards to strike out the testimony of the said co-conspirator called 'Chivo' without first introducing independent evidence, if only *prima facie*, to establish the fact of the conspiracy."

The said assignments *b* and *c* involve the objection that Ramón Jiménez was allowed to testify without any independent evidence of the existence of the conspiracy having been first introduced. However, the order in which the evidence may be admitted is discretional with the court, especially when, as in this case, the trial is not by jury; and while it

is true that independent evidence of the commission of the
offense of conspiracy is generally required before a con-
spirator is allowed to testify to the acts and conversations
of his co-conspirators, this rule is not so absolute that the
court may not vary it. The very case of the *People* v. *Comp-
ton*, 123 Cal., 407, cited by the appellants in their favor, shows
that it is not error to allow sometimes an accomplice to tes-
tify before the introduction of *prima facie* evidence to show
the commission of the offense of conspiracy, and it goes on to
hold that it is a very common practice of the courts and is
usually allowed on the condition that the People offer said
evidence later. This apparently is what occurred in the pres-
ent case, for in closing the direct examination of Ramón
Jiménez and before offering independent evidence to prove
the conspiracy, the appellants, as shown on page 57 of the
transcript of the record, moved that said testimony be
stricken out because the court admitted it on the *fiscal's*
promise that he would show its connection with the offense
charged, which connection had not been established.

This shows that the judge admitted the testimony of Ra-
món Jiménez subject to the said condition and he correctly
overruled appellant's motion, for, all the evidence of the
prosecution not having been introduced at that time, it could
not be held that the commission of the offense had not been
proved independently of said testimony. See *The People* v.
*Beltrán et al.*, 18 P. R. R., 908, and cases therein cited.

As to the fact that witness Ramón Jiménez was allowed
to testify before it had been shown whether his testimony
would refer to acts and conversations taking place prior or
subsequent to the conspiracy charged, it is sufficient to say
that as the testimony of said witness referred to acts which
took place on the day he signed the deed of acknowledgment
of the child of Josefa Rivera before Notary Abella and that
deed was inserted in the information and introduced in evi-
dence at the trial, it may be determined, therefore, that his

testimony and acts made reference to the day of the execution of the deed.

"(d) In overruling the objection of the defendants to the recital by said witness called 'Chivo' of what he told the other witness, Sama, and what Sama told him."

We do not believe that the court committed any error in allowing Ramón Jiménez to testify to what he had said to Sama and Sama's replies or in refusing to strike out said testimony, for, as to the former, Jiménez testified to words uttered by himself and not by others; and as to what Sama said to him, inasmuch as this had been testified to already by Sama himself, we think that it could not prejudice the rights of the appellants in any manner. Besides, when a trial is held before the court without a jury, greater liberality is permissible in the admission of evidence, because the court can free itself more easily than jurors from the impression caused by improper evidence.

"(e) In overruling the objection of the defendants to a leading question by the prosecution tending to suggest to said witness called 'Chivo' the date on which the acts testified to by him were committed."

It is really impossible to hold that such error exists. Witness Ramón Jiménez had testified repeatedly that he had been taken to sign a deed of acknowledgment of a child of Pastor Díaz; that he signed the deed, and although he said that he did not remember the exact date of the occurrence, inasmuch as he had identified the said document, which is dated, all that the prosecution did was to tell him that the deed was dated January 26, and this suggestion was not allowed by the court although it allowed the witness to examine the document in order to see if he could remember the date, which did not constitute error because witnesses may refresh their memories from documents.

"(f) In refusing to strike out the testimony of witness Manuel Díaz Cortada."

The appellants base this assignment of error on the ground that the witness did not state in his testimony the date of the occurrence of the facts testified to by him, and because he referred to things which are totally impertinent to the case and to statements or admissions of Pastor Díaz which are inadmissible inasmuch as they are made by a co-conspirator, while the *corpus delicti* had not been established by independent evidence.

As to the first ground of objection, although it is true that the witness could not fix the date of the occurrence of the acts which he witnessed and to which he testified, nevertheless he stated the same approximately when he testified that they had occurred "a little more than a year ago"; and while his own testimony does not give the exact date, yet, taking it in connection with the other evidence, the conclusion could be reached as to the date to which he referred.

As to the second ground of objection, his testimony was pertinent because it referred to conversations between Pastor Díaz and Ramón Jiménez in which the former told the latter that he needed him to acknowledge as his own a child which he (Pastor Díaz) had begot with Josefa Rivera and offered to pay him for such service, which is direct evidence of the *corpus delicti*. In any event it would be admissions against Pastor Díaz.

"(g) In admitting in evidence, over the objection of defendant Abella, the deed of acknowledgment dated January 26, 1911, and signed by Luis Abella Blanco, which was offered in evidence by Enrique S. Mestre, Secretary of the District Court of Guayama, a witness for The People."

Under this assignment of error it is alleged that inasmuch as the deed of acknowledgment executed by Ramón Jiménez and Josefa Rivera before Notary Abella which, it appears, was seized by order of a judge who later declared that he had no jurisdiction over the matter, was presented in evidence by Secretary Mestre, it could be given no value or authenticity, and that the only way to present the document

was by a certificate issued by the notary in whose protocol it was filed or by the presentation of the same by the notary himself. The manner in which the document was presented to the court did not impair its validity or authenticity and the fact that it was seized by the secretary by order of a judge who lacked jurisdiction was no ground for opposing its admission or for assailing its validity. Said document is the original deed signed by Josefa Rivera, Ramón Jiménez, Notary Abella and the witnesses, and is, therefore, a perfectly valid instrument. Moreover, the fact that the document was not presented to the court in the manner prescribed by the Notarial Act is no ground for objection to its admission in evidence. See the case of *The People* v. *Cerecedo*, 21 P. R. R., 52.

"(h) In allowing witness C. Domínguez Rubio, over the objection of the defendant, to state his reasons for intervening in an action distinct from those set out in the information.

"(i) In refusing to strike out the testimony of said witness notwithstanding its absolute lack of relevancy or pertinency to the conspiracy."

The above two assignments refer to the testimony of witness C. Domínguez Rubio which the appellants objected to and moved to strike out when he had finished his evidence. This witness testified only that the Judge of the District Court of Guayama had appointed him guardian *ad litem* of Josefa Rivera to bring an action of filiation against Pastor Díaz and that when he took charge of the suit in behalf of her and her child he withdrew two actions which Abella had brought against Pastor Díaz in behalf of Josefa Rivera, one for seduction and the other for breach of promise of marriage, which are those referred to in the information; and while really this testimony bears no relation to the acts which are being investigated, we cannot see that it is prejudicial to the accused, wherefore the error was not substantial.

"(j) In allowing witness Francisco Jiménez to testify, over the objection of the defendants, regarding a conversation had by the

witness with defendant-appellant Pastor Díaz after the object of the alleged conspiracy had been accomplished."

The testimony of Francisco Jiménez related to statements made to him by Pastor Díaz in a conversation had with him after the notarial act referred to had been executed and after the motions for leave to withdraw the actions had been signed, for which reason we are of the opinion that it prejudices only Pastor Díaz and not the others and was, therefore, admissible regarding him. The same is also true of the testimony of Marcelo Villalí regarding what Pastor Díaz told him and which is one of the three particular grounds of error set up in the brief of Goico.

"(k) In refusing to strike out the testimony of Darío Suárez notwithstanding its absolute irrelevancy."

Witness Darío Suárez testified that one day in January he saw Pedro Goico, Luis Abella and Agustín Colón enter the house of Josefa Rivera, and that a few days afterwards he saw Abella, Goico and Pastor Díaz leave the court and go to a hotel, where the witness went also and heard Goico say to Pastor that he should go to Ponce and prevail upon Ramón Jiménez not to testify, and that on other occasions afterwards Goico admitted to him that he had received $80.

It was moved to strike out this testimony because it referred to acts committed after the conspiracy and, moreover, because it had no bearing on the offense charged. The court overruled the motion and although it is now alleged that the court erred, we are of the opinion that there was no infraction of the law because the testimony was admissible as to Pastor Díaz and Goico although the acts occurred subsequently to the conspiracy.

The sixth assignment of error is as follows:

"In refusing to issue a subpoena *duces tecum* citing *Fiscal* Aponte to appear as a witness for the defendants and to produce the testimony which witness Ramón Jiménez, *alias* Chivo, gave before him and which was in his possession."

Although Ramón Jiménez stated that he had testified in this case before Messrs. Foote and Palacios, in Ponce, and also at police headquarters before *Fiscal* Aponte, but did not remember whether he signed or not, there is nothing in the entire testimony of this witness to show that he made any statements contrary to those made by him at the trial, therefore the lower court committed no error in overruling the motion of the appellants requiring *Fiscal* Aponte to produce the former testimony. Testimony cannot be demanded of a *fiscal* in order to look for contradictions of, or divergencies with, the testimony given at the trial, and for the purpose of showing a witness his prior deposition in any case it is necessary first to call his attention to the discrepancies, in case they exist, so that he may explain them before any documentary evidence containing the same is introduced.

Assignments of error 7 and 8:

"7. In overruling the motion for peremptory acquittal made by the defendants after The People had rested its case, on the ground of the insufficiency of the said evidence.

"8. In convicting the appellants of conspiracy on the mere testimony of an accomplice, the main points of whose evidence had not been sufficiently corroborated."

These two assignments of error are discussed together in the brief we are considering, for they refer to the insufficiency of the evidence of the prosecution and to the lack of corroboration of the testimony of accomplice Ramón Jiménez necessary to support a judgment of conviction, therefore in considering the same it is necessary to make a synopsis of the evidence for the prosecution, which we will take from the brief of the *fiscal* of this court, as we find that it agrees with the result of the trial as shown by the statement of the case.

"Manuel B. Sama.—That on the day the deed of acknowledgment was signed he saw 'Chivo' on two or three occasions in the Guayama court, where he went to consult the witness as to whether he could acknowledge the child Ramón Rivera; that he saw Pastor Díaz and 'Chivo' talking together in the house of Ramos.

"RAMÓN JIMÉNEZ.—He testified that Pastor Díaz took him from Ponce to Guayama; that they left Ponce in a carriage driven by José Miguel Díaz Cortada, *alias* Ropero, and spent the night in Jauca; that on the following day Pastor Díaz said to him that he wanted him to acknowledge a natural child of his had by a servant at the plantation and promised to give him a sum of money, to which the witness agreed provided that it would not get him into trouble; that Pastor Díaz told him that nothing would happen to him and that he had won two suits against that woman; that they arrived at Guayama; that they stopped at the house of Attorney Ramos, but he was not in his office; that Pastor Díaz went to change his clothes and witness remained there until the arrival of Ramos who asked him if he were the young man whom Pastor Díaz had brought from Ponce to acknowledge the latter's child, to which he answered affirmatively; that thereupon he invited witness to enter and sit down and shortly after he asked Attorney Ramos if he would get himself into any trouble by acknowledging the child, to which Ramos replied that nothing would happen to him, that that sort of thing was common there, that they were used to acknowledging children there and that the court had absolutely nothing to do with it; that he left the office of Ramos about 2 o'clock and casually met Pastor Díaz who asked him whether he had spoken to Ramos and told him to go to Abella's office; that he found Abella and Goyco there and that Abella asked him, 'Are you the young man whom Pastor Díaz brought?'; that thereupon he advised him to sign something and to go to Pastor Díaz for his money and then leave for Ponce; that he need not go to see the woman because that had been arranged; that not being satisfied he went to see Attorney Ramos and told him what had occurred in Abella's office and said that he was not going to do what Abella desired; that Ramos told him it was all right and to wait for him there; that he went to the court to see Judge Leake and there spoke to Sama, upon whose advice he returned to Abella's office and asked him for a copy of the deed to show to some friends and ask their advice; that Abella declined to give him the papers, explaining to him that it was not necessary and that he thereupon returned to the court and saw Sama again; that Sama showed him some papers which Josefa Rivera did not know how to sign; that he went to the house of Attorney Ramos where he found Attorneys Ramos, Abella and Goyco who were having a discussion about the lack of a witness; that as to that witness there was a doubt as to whether he was sufficiently in the confidence of Pastor Díaz to come and sign; that about this time they brought the witness and all of

them left there for Josefa's house; that they went in and Abella said to Josefa, 'We have come so that you may sign and Pastor Díaz may acknowledge his child,' to which she replied, 'All right,' and signed; that Goyco, Abella, another gentleman and the witness were present; that Abella began to read something and said to Josefa, 'Sign here'; that she took a pen and began to sign and he acted in a way that seemed to indicate that he was anxious that she should sign. He helped her to make the letters of her name little by little. Then Goyco and the other gentleman signed and they asked the witness to sign; that he answered, 'Not here; I will sign at Ramos' house'; that they went to Ramos' house whence he left hastily for the hotel and saw Sama who advised him to sign; that he went again to the office of Ramos and signed. Later, Pastor Díaz left and returned with a small sum of money; that he handed him an amount and it appeared a little later that he was in need of more, whereupon Ramos handed Pastor Díaz a check for $25.50; that a discussion thereupon arose in which Pastor Díaz insisted that a stamp should be affixed to the papers, which was impossible, Abella and Ramos said, because the office was closed and it was late; that there was a feeling of mistrust; that they then agreed and, in order to put an end to the argument, Attorney Ramos said to the woman called María, 'María, bring me the key of the safe and lock up these papers in order to close the discussion'; that she came, brought the key and locked the documents in the safe; that he then left with Pastor Díaz, who told him in the Plaza that he would meet him in the morning; that on the morning of the following day he told witness not to go to Ponce but to remain and gain the ascendancy over the woman, take her to Ponce, make a prostitute of her and take away her money; that he had never seen Josefa Rivera before. and had never had carnal intercourse with her; that he knew her child Ramón; that Pastor Díaz did not accompany them to the house of Josefa Rivera the day they arrived from Ponce.

"JOSEFA RIVERA testified that Pastor Díaz is the father of her child, which is about three years old and named Ramón Pastor; that she brought an action against Pastor Díaz and that Abella was her attorney; that the action was for the abandonment of minors; that she complained to Judge Leake respecting those actions; that Abella went to her house and told her that he had to compromise the matter because he had no chance of winning the suit and that she told him to compromise provided Pastor Díaz acknowledged the child and agreed to support it; that he told her that Díaz was also going to give her $450 by way of compromise; that she answered that if

he acknowledged the child and agreed to support it she was willing that he (Abella) should make any compromise he liked, but not otherwise, for she would engage another attorney and proceed with the case; that Abella told her he had no further evidence and she replied that she had more than enough, whereupon Abella said that Pastor was bound to win the suit, to which she answered, 'If he is bound to win why seek to compromise?'; that Abella replied that he (Pastor) was not aware of this and that it was necessary to hurry before Pastor became aware that his suit was virtually won, because he would refuse to compromise then; that she replied that he could do what he pleased after Pastor had acknowledged the child; that Abella promised to ascertain whether Pastor would acknowledge and support the child, and he also promised to give her $450; that Abella left after promising to return soon; that he was accompanied by Pedro Goyco; that about half an hour later Abella returned with Goyco and two others whom she did not know; that they brought a document which they told her to sign and which they made her sign; that she signed three times; that she then said to Abella, 'Look here, Abella, remember that he is to acknowledge the child,' and he answered, 'Yes, and he will give you $450 besides and pay for the child's support monthly, what more do you want?'; that she answered, 'If he doesn't agree to this I will proceed with the suit although I lose; above everything else I want him to acknowledge my child'; that Abella said, 'The object of these people in coming here is to witness that Pastor is going to acknowledge the child'; that those present said that this was so; that after making her sign they left; that she was on the balcony with María Vázquez about 5 or 6 p. m. when a young man whom she did not know approached and asked her whether she was willing that he should acknowledge that he was the father of her child; that she told him that he was insolent and said she did not know him, that the father of her child was Pastor Díaz as true as her name was Josefa Rivera and for him to keep out of the matter unless he wanted to go to the penitentiary; that he told her that everything was arranged and that the only thing lacking was his signature and that he was going to sign, to which she replied that if he dared to do so he would go to the penitentiary and called him impudent; that thereupon he left and she and María Vázquez followed him; that they went to the office of Attorney Ramos who came out and asked what was the matter; that she answered that Abella had been to her house about a suit in which he represented her and told her that Pastor Díaz was going to acknowledge her child, pay her monthly for its sup-

port and give her $450, but that it now appeared that they had brought a man whom she did not know to acknowledge her child and that she was not going to allow it; that he told her he could not do anything and simply advised her to complain to the judge or to go and talk to Abella, as he (Ramos) did not wish to have anything to do with the matter; that she then went to the judge and told him what had occurred; that they had offered her a sum of money which she refused to accept; that Abella Blanco had offered it to her; that the people who went to her house to sign the papers were Abella, Goyco and two others whom she did not know; that they told her that the signatures were necessary for the acknowledgment of the child and that believing this she signed; that she knows Pedro Goyco; that it was he who went with Abella to her house; that those two were the first to go there and four persons came later; that when the first two went to her house Goyco told her that she had better compromise because she would get nothing if she continued the action and it was best to settle; that later Goyco and Abella again went to her house with two men with whom she was not acquainted; that when the two alone called on her it was about 3 o'clock and about half an hour later the four of them arrived.

"MIGUEL DÍAZ CORTADA testified that he heard the conversation between Pastor Díaz and Ramón Jiménez, *alias* Chivo, when the former told the latter that he had a child and asked whether he would acknowledge it, offering him money; that he saw Pastor and Jiménez when they went to the office of Ramos; that he accompanied Ramón Jiménez later to Abella's house and was present when Jiménez asked Abella for some papers.

"IRVING McMANUS testified that he was Marshal of the District Court of Guayama from May 27, 1911, to November 8, 1911; that he received an order from the court to seize a document in the custody of Notary Abella Blanco; that he seized the document and delivered it to the court, which he identified as the one exhibited, namely, a deed numbered 1 and executed before Notary Abella in which Ramón Jiménez acknowledges the paternity of a child born during his relations with Josefa Rivera.

"ENRIQUE S. MESTRE.—That he saw 'Chivo' speaking to Pastor Díaz in the house of Ramos on that day, and he identified the deed of acknowledgment; that when Abella filed the motion for leave to withdraw the judge overruled the same and appointed Domínguez guardian *ad litem* of Josefa Rivera, who withdrew the two suits and brought another of filiation.

"C. DOMÍNGUEZ RUBIO.—That Judge Leake appointed him guar-

dian *ad litem* of Josefa Rivera in order to prosecute an action of filiation against Pastor Díaz; that when he began to act for Josefa Rivera and the minor Ramón, her attorney was Abella; that two suits had been brought against Pastor Díaz, one for seduction and the other for breach of promise of marriage.

"MARCELO VILLALÍ testified that he spoke to Pastor Díaz in Ponce and Díaz told him that there was a woman in Guayama who had a child by him; that he had been sued but had arranged the matter with Abella Blanco for $300, and as someone had to acknowledge the child, he had brought Ramón Jiménez to Guayama to make the acknowledgment.

"GERMÁN BANK testified that he is a clerk and lives at Central Fortuna; that in January, 1911, he was a clerk in the office of Attorney Ramos; that he recalls having typewritten the paper shown him (motion for leave to withdraw in the case of Josefa Rivera against Pastor Díaz for seduction); that this occurred about two years ago; that Abella had been at the office once or twice on the day that he typed the motions; that Attorney Abella went to the office of Ramos with the notarial deed of acknowledgment of the natural child of Josefa Rivera by Ramón Jimínez and a part of the said deed was there amended or drawn up anew; that the said amendment was made because of an observation made by Ramos to Abella; that Ramos called Abella's attention to something which the witness does not remember; that he heard Ramos say that Enrique Vidal, who witnessed the deed, was not reliable; that the amendment was made with the pen of witness; that he gave the pen to Abella who made the correction in his presence; that the correction was made on the last page of the deed; that Abella then left the office; that he knows Pedro Gerónimo Goyco; that he believes he was also at the house of Ramos on that day; that the deed shown him and which he identifies is the one acknowledging the status of natural child of the minor Ramón Rivera; that he is unable to say positively that the amended deed was the deed of acknowledgment; that he did not read the said deed; that the amended deed did not remain in the hands of Ramos but was taken away by Abella; that the motions for leave to withdraw were dictated by Ramos; that the said motions were typed by the witness during the morning; that the amendment of the deed took place in the afternoon about closing time; that the deed of acknowledgment was not signed at the house of Ramos; that nothing was signed there; that Goyco was in the habit of going frequently to the office of Ramos; that Abella also used to go there quite often.

"Francisco Jiménez testified that Pastor Díaz went to his house in Ponce and offered him money to induce Ramón Jiménez to testify that he used to go to Guayama and that he had carnal intercourse with Josefa Rivera during such trips.

"Darío Suárez.—That one day during the month of January he saw Goyco, Abella and Agustín Colón go to the house of Josefa Rivera; that three or four days later he saw Pastor, Abella and Goyco and heard Goyco say to Pastor that he ought to go to Ponce and persuade 'Chivo' not to testify and so avoid a disagreable surprise; that a few days later Goyco said to him that they had given him $80; that he was an agent, a hireling; that they had hired him and he had served them."

As documentary evidence there were introduced the motions of withdrawal in case No. 160, Josefa Rivera against Pastor Díaz Molinaris for damages for breach of promise of marriage, and in case No. 1377, Josefa Rivera against Pastor Díaz Molinaris for damages for seduction, which motions are dated January 26, 1911, and deed No. 1 of acknowledgment of natural child, executed on January 26, 1911, by Ramón Jiménez Rodríguez and Josefa Rivera before L. Abella Blanco.

Before analyzing the testimony given at the trial by the witnesses for the prosecution we wish to point out that the appellants maintain that the *corpus delicti* has not been proved; that Ramón Jiménez is an accomplice; that his testimony has not been corroborated, and that before holding that the evidence is sufficient to support a judgment of conviction, we should explain how the testimony of said accomplice has been corroborated. We agree that under the provisions of section 253 of the Code of Criminal Procedure the testimony of accomplices must be corroborated and also that when, as in the present case, it is alleged that the testimony of the accomplice has not been corroborated and we hold to the contrary, we should explain the manner in which it has been corroborated.

The appellants place great reliance upon the opinion in the case of *People* v. *Coffey,* 161 Cal., 433, which they consider similar to this case and in which it was held that the

testimony of the accomplice was not corroborated. We are of the opinion that the cases are not parallel.

In the case cited it was held that a part of the testimony of the accomplice could not corroborate his own testimony, also that the testimony of witnesses who were not accomplices, to the effect that the defendant had voted in favor of granting a franchise to a certain company, was no corroboration of testimony that the vote had been given as the result of a conspiracy, and that the fact that said company executed a document by which it held Coffey liable for any crime which may have been committed by him as a member of the franchise committee, was likewise no corroboration of the testimony of the accomplice regarding the conspiracy.

We repeat that we do not consider that there is any similarity between that case and this, in which a document—the deed of January 26, 1911,—was executed by which it appears that Ramón Jiménez and Josefa Rivera acknowledged that they had sustained sexual relations as a result of which the child Ramón was born. This document of itself alone does not prove the conspiracy, but it does so when Josefa Rivera testifies to the falsity of the statements contained therein by denying that she had known or had ever had sexual relations with Jiménez or that he was the father of her child Ramón, and by declaring that she was assured that the said deed was an acknowledgment by Pastor Díaz of his paternity of the said child and that under this belief she signed the motions for leave to withdraw the actions she had brought against him. Therefore, this testimony of Josefa Rivera, together with the said deed and the motions for leave to withdraw, corroborates the testimony of Ramón Jiménez to the effect that it was all the result of a conspiracy. Such a conspiracy must be proved almost always by circumstantial evidence, for the nature of the offense makes it impossible generally to show by direct proof the plottings and agreements constituting the conspiracy.

In support of the foregoing we quote the pertinent parts of the following opinions:

"The ultimate fact here, of course, was the conspiracy on the part of the defendant with the other parties named in the commission of the crime; but it is not necessary in order to establish that fact to prove that the parties met and actually agreed to jointly undertake such criminal action. From the secrecy with which unlawful undertakings are adopted it would be generally impossible to make such proof by direct testimony. Evidence is indirect as well as direct,—consisting of inferences and presumptions,—and it is code law that upon the trial of a case evidence may be given of any facts from which the facts in issue are presumed or are logically inferable; and the jury, by the exercise of their judgment or reason, warranted by a consideration of the usual propensities of passions of men, may make such deductions or draw such inferences from the facts proven as will establish the ultimate fact or facts in issue." *People* v. *Donnelly,* 143 Cal., 398.

"All the text books agree that the evidence in proof of the conspiracy may be, and from the nature of the case generally must be, circumstantial. All concerted action to violate the law or to commit a fraud is secret, and is ordinarily shown by separate independent acts, tending to exhibit a common design. The common design is the essence of the charge, and to prove it it is not necessary to prove that the parties came together and actually agreed in terms to have that design, and to pursue it by common means.

"The jury will be justified in inferring the existence of a conspiracy when the Government satisfies you beyond a reasonable doubt, by the testimony of credible witnesses, that any two or more of the parties charged aimed, by their acts, to accomplish the same unlawful purpose or object, one performing one part, and another another part of the same, so as to complete it, although they never met together to concert the means, or to give effect to the design. Nor is it necessary that the conspiracy should originate with the persons charged. Every one coming into a conspiracy at any stage of the proceedings, with knowledge of its existence, is regarded in law as a party to all the acts done by any of the other parties, before or afterwards, in furtherance of the common design." *United States* v. *Sacia,* 2 Fed., 754–757.

"A conspiracy may be proved inferentially, or by circumstantial evidence." 6 Am. & Eng. Encyc. of Law, 864.

"A conspiracy, like most other facts, may be proved by circum-

stantial evidence. Indeed, it is not often that the direct facts of a common design, which is the essence of a conspiracy, can be proven otherwise than by the establishment of independent facts, bearing more or less remotely upon the main central object, and tending to convince the mind reasonably and logically of the existence of the conspiracy.

"In the language of Greenleaf: 'If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object.' (3 Greenl. Ev., sec. 93; *United States* v. *Doyle,* 6 Saw., 612.)" *People* v. *Bentley,* 75 Cal., 409.

"Where several [persons] had entered into a conspiracy to defraud the plaintiff, it was held that an act done by any of the defendants in furtherance of the common design, and in accordance with the plan of the conspiracy, became the act of all, with coequal responsibility for its consequences. *Page* v. *Parker,* 43 N. H., 363; 80 Am. Dec., 172." 6 Am. & Eng. Encyc. of Law, 871.

According to the foregoing, if in a case of conspiracy it is proven that by their acts the defendants pursue the same object by the same means, one performing one part and another another part, the crime is proven, as it has been in the case at bar.

In order to determine whether all of the defendants are principals in the conspiracy, the part taken by each of them in the accomplishment of the same should be considered in the light of all the acts performed by each.

As we have stated, the testimony of Ramón Jiménez, *alias* Chivo, was corroborated by Josefa Rivera, for she tells us that Abella and Goyco went to her house for the purpose of signing the deed of acknowledgment, although they made her believe that the object was to have Pastor acknowledge the child and so compromise the suits, which shows that Abella and Goyco took part in the conspiracy. As to Pastor Díaz, the testimony of Ramón Jiménez that he (Pastor) took him to Guayama to acknowledge a child which Josefa Rivera had had by him (Pastor), is corroborated by witness Miguel Díaz

Cortada, *alias* Ropero, who also saw Ramón Jiménez in the office of Notary Abella. Sama and Mestre corroborated Ramón Jiménez; Sama on the point referring to the deed and to the fact that he was requested to acknowledge a child which was not his, and both testified that they saw him in the office of Ramos talking to Ramos and Pastor Díaz on the day that the acts were performed. As to Pastor Díaz, the testimony of Marcelino Villalí and Francisco Jiménez charges him with acquiescing in said acts, and as regards Pedro Goyco, besides the testimony of Josefa Rivera, the statements he made to Darío Suárez prove that he was a party to the crime. Therefore, taking all the evidence as a whole, we may reach the conclusion that all the appellants participated directly in the conspiracy.

The ninth and last ground of the appeal reads as follows:

"Failure to apply the provisions of subdivisions 1, 3 and 4 of section 162 of the Law of Evidence to the evidence introduced by the prosecution."

The section referred to prescribes that the effect of evidence is not arbitrary but is to be exercised with legal discretion; that the court is not bound to decide in conformity with the testimony of any number of witnesses which does not carry conviction to its mind against that of a less number, or a presumption or other evidence which may be convincing; that a witness who has testified falsely in one part of his testimony is to be distrusted in others; that the testimony of an accomplice ought to be viewed with distrust and the evidence of the oral admission of a party with caution.

In laying down the said rules the only object of that section of the law is to call the attention of the court to specific circumstances which it should bear in mind when forming its conclusions as to the evidence, but does not deprive the court of its discretional power to weigh the same; and although a witness may contradict himself, he may be given credence when such contradictions do not bear upon essential points,

provided the court should believe beyond a reasonable doubt that in all other respects he has told the truth.

It is true that in the present case Ramón Jiménez and Josefa Rivera made some contradictory statements, but notwithstanding that, the judge may believe that they told the truth as to the essential facts of this prosecution. It is a well-settled rule, and we have laid it down in many cases, that this court will not interfere with the weighing of the evidence by the court *a quo* unless it is shown that it was influenced by passion, prejudice, or that manifest error was committed, and the contradictory statements made by Ramón Jiménez and Josefa Rivera in a part of their testimony were not so important as to make it necessary to reject their testimony absolutely. The judge of the lower court who heard said witnesses testify believed them notwithstanding some contradictory statements made by them and as we think that he was not bound to. reject their testimony *in toto* because of such contradictions, we cannot hold that the court committed the error assigned.

In conclusion we will say that the defendants also attacked the information because, according to the facts alleged therein, it was sought to secure the withdrawal of two suits whose nature appears from the information itself, and in neither of them were any possible rights of the minor, Ramón Rivera, involved; for which reason they maintain that it cannot be adduced from the said information that they conspired to deprive the said minor of his rights. The contrary ruling of the court upon this point is deemed an error and is assigned as No. 3, in the brief of Pedro Goyco.

The allegation in the information covering the two actions brought by Josefa Rivera is only for the purpose of charging that, among other things, the object of the conspiracy was to pervert and obstruct public justice, which does not prevent its having a further design of defrauding the said minor of his rights; but even though such design did not exist or could not be accomplished by the acts charged against

the defendants, that objection could not be sustained if the other charges of the information were sufficient; for when an information charges different offenses or ways of committing the offense, an allegation sufficient for any of them and its proof justify a conviction. In the case of *The People* v. *Collazo,* 20 P. R. R., 190, we said that when a statute makes it a crime to commit any one of several acts mentioned disjunctively, all or any of them may be charged conjunctively.

Having reached the conclusion that the lower court did not commit the errors assigned in this appeal, it should be dismissed and the judgment appealed from

*Affirmed.*

Chief Justice Hernández and Justices Wolf and del Toro concurred.

Mr. Justice Hutchison took no part in the decision of this case.

A motion for reconsideration having been filed, it was overruled by the court on April 14, 1915.